# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELORES MACIAS, | Case No. 1:15-cv-00107-SKO |
| Plaintiff, | **ORDER ON PLAINTIFF'S SOCIAL SECURITY APPEAL** |
| v. | (Doc. No. 1) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Delores Macias ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act. 42 U.S.C. §§ 405(g); 1383. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 11.)

**FACTUAL BACKGROUND**

Plaintiff filed an application for SSI on January 28, 2011, alleging disability beginning on October 18, 2009, caused by schizophrenia disorder, bipolar disorder, and depression. (Administrative Record ("AR") 124, 128.) Plaintiff was born on October 8, 1975, she did not complete high school, and she was not enrolled in any special education classes. (AR 184, 257.)

**A.   Relevant Evidence**

In November 2010, Plaintiff was referred by the Fresno County probation department to Fresno County Behavioral Health ("Behavioral Health") where she underwent a comprehensive mental health assessment with Guy Gadd, a Licensed Marriage and Family Therapist, who provided a report. (AR 186-94.) Plaintiff indicated she had spent approximately four months at a residential treatment program for substance abuse, and she was released from the program in October 2010. (AR 186.) She had been hospitalized in February 2010 for suicidal thoughts, and she had been to Cedar Vista Hospital, a behavioral health center, "a couple of times." (AR 186.) Plaintiff reported depression and anxiety as her chief complaints, and Mr. Gadd diagnosed Plaintiff with bipolar disorder and assigned her a Global Assessment of Functioning ("GAF") score of 50. (AR 186, 190.)

On February 10, 2011, Plaintiff was seen at Behavioral Health for a psychiatric evaluation. (AR 183-185.) Plaintiff reported she had been off her medication for a year, but because she now had medical care she could resume her medication. (AR 183.) She reported she had taken Depakote with a good response in the past. (AR 183.) She was diagnosed with bipolar disorder and prescribed Abilify, Lamictal, and Klonopin. (AR 185.)

On February 20, 2011, Plaintiff was admitted to the Emergency Room after ingesting pills, ostensibly a suicide attempt. (AR 195-96.) She indicated to staff that she wanted to die, and that she would jump in front of a car if she was released. (AR 195.) She also apologized to staff for hitting a security guard. (AR 195.) She was then transferred to Good Samaritan Hospital for additional care. (AR 228.)

At Good Samaritan Hospital, Plaintiff denied any auditory or visual hallucinations. (AR 228.) She was placed on an involuntary 5150 hold, and she was involved in group and

individual therapy sessions.  (AR 228.)  At the time of her discharge on February 23, 2011, Plaintiff denied any depression, suicidal or homicidal ideation, auditory or visual hallucinations or any side effects from medication.  (AR 229.)  She was advised to follow-up with her primary care provider for any other complications, and medications were called into the pharmacy.  (AR 229.)

On June 7, 2011, Plaintiff was seen at Behavioral Health, and she was noted to appear depressed, but she was well groomed, cooperative, had normal cognition, speech, and orientation; her thought process was organized and her thought content was normal; she had a normal affective range, and her insight and judgment was considered normal.  (AR 246.)  Because she remained depressed, attending physician Dr. LeRoy Ramsey adjusted her prescriptions for Lamictal and Depakote.  (AR 247.)

On June 12, 2011, Plaintiff was seen by Mary Lewis, Psy.D, for a comprehensive psychiatric evaluation.  (AR 257-63.)  Plaintiff reported to Dr. Lewis she was seeking disability benefits because she could not work, and her chief complaint was of auditory hallucinations.  (AR 257.)  Plaintiff reported she first heard voices when she was 23; at that time she was also "doing drugs."  (AR 257.)  Plaintiff reported taking Divalproex, Lamotrigine, and Clonazepam and she was admitted to a psychiatric hospital in 2010 for an overnight stay because she "took too many pills."  (AR 258.)  She began smoking methamphetamine at the age of 21, but she ceased in 2010; she also smoked cocaine at the age of 15 through 16 on a daily basis.  (AR 258.)  Plaintiff was last employed between October 2009 and February 2011 as a housekeeper at a hotel.  (AR 258.)  She stopped working because she "got fired," although she reported good working relationships with her boss and co-workers.  (AR 258.)  Plaintiff informed Dr. Lewis that she was "not willing to work in any job position, [wa]s not actively seeking employment, and [wa]s not involved in a retraining program."  (AR 259.)

Dr. Lewis observed Plaintiff looked older than her stated age, her hair was neatly combed, and she was wearing makeup.  (AR 259.)  Plaintiff had manicured fingernails, her hygiene was good, as was her eye contact; Plaintiff's facial expressions were appropriate.  (AR 259.)  Plaintiff's behavior was cooperative, and her attitude was pleasant.  Dr. Lewis deemed Plaintiff's global capacity to act purposefully, to think rationally, and to deal effectively with her environment were

3

not significantly impaired. (AR 259.) Dr. Lewis assigned Plaintiff a GAF score of 63, and offered the following professional observation:

> The claimant's reported symptoms of auditory hallucinations appear to be inconsistent and the presentation of symptoms are not typical of a major mental disorder. Despite the claimant's reported symptoms and history, she does not appear to be suffering from a major mental disorder at this time. From a mental health perspective, the claimant appears to be able to function adequately.

(AR 262.) Dr. Lewis opined Plaintiff had no significant impairments in any of her abilities. (AR 262-63.)

On July 5, 2011, state agency physician Russell Phillips, PhD, completed a psychiatric review technique form. (AR 264-76.) Dr. Phillips concluded Plaintiff's reported mental condition was not severe, and it was "expected that with continuous treatment and abstinence, the claimant's impairments will again not be severe by 1/1/2012." (AR 276.)

On July 26, 2011, Plaintiff was seen by Ani Tokat, M.D., at Behavioral Health. (AR 362-63.) She was seen for a poor response to multiple medications. (AR 362.) Plaintiff's Depakote was changed to take it in the evening rather than in the morning, and Plaintiff did not want to take the Klonopin anymore, so it was not prescribed. (AR 362.) Although Dr. Tokat assigned a GAF score of 51, she noted normal insight and judgment, thought content, orientation, speech, cognition, and indicated Plaintiff was well-groomed in appearance and her behavior was cooperative. (AR 361-62.)

Plaintiff followed up with Dr. Tokat on August 9, 2011, and indicated she was still feeling depressed, had mood swings, and was feeling angry. (AR 359.) It was noted that Plaintiff's dissociative symptoms pointed to a borderline personality disorder, and it was recommended that she follow-up with Dr. Tokat in four weeks. (AR 360.)

On August 29, 2011, state agency physician E. Aquino-Caro, M.D., reviewed Plaintiff's medical records, noted Plaintiff's activities were not severely limited and she was able to care for her children, and Dr. Aquino-Caro agreed that Plaintiff's condition was not severe. (AR 307.)

On September 27, 2011, Plaintiff again followed up with Dr. Tokat. (AR 355-56.) She reported she had stopped taking the Lamictal because it had been discontinued at Walgreens.

4

(AR 355.) Plaintiff had more feelings of depression over the prior week, and she had thoughts of hurting herself. (AR 355.) Dr. Tokat assigned a GAF score of 51, and indicated Plaintiff needed to restart the Lamictal as it seemed stopping the medication had automatically resulted in a worsening of her symptoms. (AR 356.) Plaintiff denied any suicidal ideations or hallucinations but did "endorse seeing shadows." (AR 356.) Plaintiff was to follow-up in two weeks. (AR 356.)

At a follow-up examination on November 15, 2011, Plaintiff reported to Dr. Tokat that she had felt suicidal the prior week. (AR 342.) She reportedly took too many Depakote pills. (AR 342.) Dr. Tokat observed, however, that Plaintiff had dyed her hair and looked cheerful while playing with her son in the waiting room. (AR 342.) Plaintiff reported starting individual therapy and that she liked her therapist. (AR 342.) Dr. Tokat assigned Plaintiff a GAF score of 51, and noted that "[g]iven her current overdose of Depakote (about 10 pills) with the intention to end life, she will require med modification to target her depression and poor impulse control." (AR 343.)

On November 18, 2011, Plaintiff's therapist Enrique Chaparro-Nieto, entered a progress note indicating Plaintiff was crying and upset. (AR 340.) He stated she was "going [through] major issues," but denied any current suicidal intentions. (AR 340.)

On December 1, 2011, Plaintiff was brought to Behavioral Health by her husband. (AR 335.) He reported to the staff that Plaintiff had attempted to end her life by finishing the bottle of Clonazepam and cutting both her wrists. (AR 335.) Plaintiff was taken by ambulance to a hospital for medical clearance before being admitted to a psychiatric hospital. (AR 335.)

Plaintiff met with a counselor at Behavioral Health on December 9, 2011, and they discussed her hospitalization. (AR 331.) Plaintiff reported she did not know why she was placed on an involuntary psychiatric hold, and her therapist explained it was because she took 90 pills and cut her wrists multiple times. (AR 331.) At the end of her session, Plaintiff stated she felt better and that if she had further thoughts of harming herself, she would call 911. (AR 331.)

On December 12, 2011, Plaintiff participated in therapy sessions and admitted to being an angry person with constant automatic negative thinking. (AR 330.) Plaintiff denied any crisis or

major issue, and she felt stable through a combination of medication, activity, support, and therapy as needed. (AR 330.)

On March 21, 2012, state agency psychiatrist Marina C. Vea, M.D., reviewed Plaintiff's medical records and completed a psychiatric review technique form. (AR 365-75.) Dr. Vea opined Plaintiff's impairments were not severe, and noted there was no degree of limitation in Plaintiff's activities of daily living, social functioning, concentration, persistence, or pace. (AR 373.)

In July 2012 at a follow-up at Behavioral Health, Plaintiff reported doing very poorly; she was having difficulty getting her prescription for Lamictal refilled, and the Depakote and Prozac were only minimally effective. (AR 171.) She reported current struggles with suicidal thoughts, irritability, and that she could not control her feelings. (AR 171.) She reported hearing voices and having nightmares all the time. (AR 171.) Plaintiff was assigned a GAF score of 55, and it was noted Plaintiff reported improvement with regard to mood instability. (AR 172.) Shortly after this follow up, Plaintiff became incarcerated.

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 24-44, 57.) A hearing was held on May 28, 2013, before an ALJ. (AR 393-428.)

On June 14, 2013, the ALJ issued a decision, finding Plaintiff not disabled from January 28 2011, through the date of decision. (AR 17-23.) Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since January 28, 2011, the date of her application (AR 19); (2) Plaintiff had the following medically determinably impairments: bipolar disorder; history of polysubstance abuse; and asthma (AR 19); but (3) did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities and therefore did not have a severe impairment. As such, the ALJ concluded Plaintiff was not disabled at Step Two of the sequential evaluation.

Plaintiff sought review by the Appeals Council on June 25, 2013. (AR 12-13.) The Appeals Council denied Plaintiff's request for review on November 18, 2014. (AR 6-9.)

6

Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

**D.  Plaintiff's Argument on Appeal**

Plaintiff contends the ALJ failed to properly evaluate the medical evidence and failed to give specific and legitimate reasons for rejecting the opinions of Plaintiff's treating psychiatrist. (Doc. 18.)

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The

impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

Plaintiff argues the ALJ erred in finding her mental impairments are not severe at the Second Step of the sequential evaluation. Plaintiff contends her treatment records establish her mental impairment had more than a minimal effect on her functioning and was thus severe: Plaintiff was hospitalized numerous times for suicidal ideation/attempts; and she was taking anti-

psychotic, anti-convulsant, and anti-depressant medication, which underscores the severity of her condition.

The Commissioner asserts the ALJ properly relied on substantial evidence in concluding Plaintiff's mental impairment was not severe: four state agency examining and reviewing physicians opined Plaintiff did not have a severe mental impairment.

**A.   The ALJ did Not Err at the Second Step of the Sequential Evaluation**

**1.   Legal Standard**

At the Second Step of the sequential evaluation, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987)). Pursuant to the agency's regulations, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities. 20 C.F.R. § 416.921(a). Basic work activities are those "abilities and aptitudes necessary to do most jobs," and include (1) physical functions such as walking, standing, sitting, lifting and carrying; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. at § 416.921(b). A reviewing court should not disturb the non-severe finding if it is based on "clearly established medical evidence" and the conclusion is supported by substantial evidence.

These regulations are intended to identify at an early stage those claimants whose medical impairments are "so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. The regulations, however, should not be used to prematurely disqualify a claimant from disability. *Id.* at 158 (O'Connor, J., concurring). Thus, at the Second Step, "[a]n impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290). If a "not severe" finding is not clearly

established by medical evidence, "adjudication must continue through the sequential evaluation process." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3. As such, the Second Step "is 'a de minimis screening device [used] to dispose of groundless claims[.]'" *Webb*, 433 F.3d at 687 (quoting *Smolen*, 80 F.3d at 1290).

### 2. Clearly Established Medical Evidence Supported "Not Severe" Finding

Although the ALJ found Plaintiff had medically determinable impairments, he nonetheless concluded they were not severe at the Second Step. The ALJ noted Plaintiff's treatment for bipolar disorder "appeared to be effective." (AR 20.) The ALJ considered the evidence of Plaintiff's involuntary psychiatric holds, during which Plaintiff exhibited a depressed mood and constricted affect with poor insight and judgment, as well as her treating between November 2010 and July 2012 at Behavioral Health. The ALJ also assessed Dr. Lewis' examination of Plaintiff in June 2011 where Dr. Lewis performed a comprehensive psychiatric evaluation and opined Plaintiff was not significantly limited in any area of mental functioning. The ALJ noted that three additional state agency reviewing physicians affirmed Dr. Lewis' opinion, and their review of Plaintiff's records included evidence regarding her hospitalizations in February and December 2011 stemming from suicide attempts.

Despite that the non-disability determination was made at Step-Two where the threshold for finding a severe condition is low, it remains Plaintiff's burden to establish the severe nature of her impairments. Moreover, the ALJ's decision must be upheld even where the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005). Here, there is substantial evidence comprised of clearly established medical evidence to support the ALJ's non-severe finding with regard to Plaintiff's mental impairments.

The record is devoid of any treating physician's opinion regarding Plaintiff's functionality.[2] Instead, four state agency physicians — both examining and reviewing — opined Plaintiff's condition was not severe. Dr. Lewis examined Plaintiff in June 2011, reviewed all the relevant records from Behavioral Health, and considered the discharge summary from the Good Samaritan

---

[2] Plaintiff's argument that the treating physicians' GAF score assessments were not adequately assessed by the ALJ is considered below.

10

Hospital where Plaintiff was placed on an involuntary psychiatric hold in February 2011 due to a suicide attempt. (AR 257-63.) Dr. Lewis found Plaintiff's reported symptoms to be atypical of a major mental disorder. (AR 262.) On examination, Plaintiff described a fairly high level of social and daily activity functioning: she took care of her children, performed household chores, and she had several friends she had been close to for a number of years. (AR 261.) Plaintiff denied suicidal ideation, exhibited thought processes within normal limits, and her mood was euthymic— i.e., not depressed or highly elevated; normal. (AR 259.)

Plaintiff asserts the ALJ emphasized clinical findings that had nothing to do with Plaintiff's mood disorder and instead dealt with her cognitive abilities – which are not in question. While some of the examination findings the ALJ cited were more indicative of cognitive functioning than emotional functioning, Dr. Lewis, who specifically opined as to the severity of Plaintiff's condition in June 2011, was aware Plaintiff's chief complaint and impairment were not cognitive issues. (AR 257-58.) From a mental health perspective, Dr. Lewis concluded Plaintiff was able to function adequately, and she did not appear to be suffering from a major mental disorder "at that time." (AR 262.) Dr. Lewis' opinion was affirmed by Dr. Phillips in July 2011(AR 264-76); he considered Plaintiff's admission to Good Samaritan Hospital to be a "brief acute episode without ongoing outpatient treatment," and confirmed Plaintiff's condition – which he diagnosed as a mood disorder – was not severe in nature. (AR 276.) A second reviewing physician, Dr. Aquino-Caro, concurred with Dr. Lewis and Dr. Phillips that Plaintiff's condition was non-severe. (AR 307.) Finally, upon review of all additional medical evidence, Dr. Vea diagnosed Plaintiff with a schizoaffective disorder but affirmed the opinions of each of the previous physicians in March 2012 that Plaintiff's mental impairment did not significantly limit her functioning. (AR 377.) Without any contradictory medical opinions, this is clear medical evidence of the non-severity of Plaintiff's mental impairment.

Plaintiff also argues the ALJ gave weight to Dr. Lewis' opinion, but while Dr. Lewis did not diagnose a mental disorder, the ALJ found Plaintiff had a medically determinable bipolar condition. Plaintiff maintains it was egregious error to accept her treating physicians' diagnoses of bipolar disorder, but not their opinions as to Plaintiff's functionality. The precise diagnoses made

by Plaintiff's treating physicians at Behavioral Health was often bipolar disorder (*see e.g.*, AR 173, 185, 248, 253), but also included borderline personality disorder (AR 173). She was diagnosed with schizoaffective disorder rather than bipolar disorder at Good Samaritan Hospital during her involuntary psychiatric hold, a diagnosis with which Dr. Vea agreed. (AR 228.) Bipolar disorder was diagnosed with greater frequency by treating physicians. It was not error for the ALJ to accept that diagnosis, but conclude that the limitations stemming therefrom did not appear to be sufficient to cause significant functional limitation. The precise nature of Plaintiff's mental impairment is not dispositive of her functional ability; even if the ALJ erred in determining her precise mental condition, there was still insufficient evidence to show that her condition caused her significant functional limitation.

Plaintiff argues her treating records, particularly her two involuntary hospitalizations for suicide attempts in February and December 2011, are evidence her impairments result in more than mild functional limitation. (Doc. 23, 2:6-9.) While Plaintiff's two episodes of attempted self-harm do exemplify Plaintiff's struggle with her mental impairment, they do not in and of themselves show that she is functionally limited on a daily basis. The examining and reviewing physicians also considered this information, and Dr. Phillips indicated the episode in February 2011 was acute and because ongoing outpatient care was not required, the self-harm incident did not signify significant or severe functional limitation. (AR 276.) These were the uncontradicted opinions of medical doctors specialized in the mental health field. To the extent Plaintiff argues these treating records should be interpreted differently, this is not based on any medical opinion – it is Plaintiff's lay assertion of how the treating records should be interpreted.

Plaintiff also contends the fact that she was prescribed medication for her mental impairment establishes its severity. (Doc. 23, 2:9-13.) As with her hospitalization for self-harm attempts, the prescribed medication was also considered by all the examining and reviewing physicians who concluded Plaintiff's condition did not cause more than mild impairment of her functional abilities. Millions of people are prescribed medication for a huge variety of medical conditions, but a prescription for medication does not ipso facto translate to significant functional limitation. Prescriptions alone for mental health symptoms do not establish functional limitation,

particularly as Plaintiff's prescription medication was documented within her treatment records and was therefore considered by the physicians who expressly considered Plaintiff's functionality.

**B.     The ALJ Did Not Err In Failing To Expressly Discuss Plaintiff's GAF Scores**

Plaintiff contends the GAF scores assigned by various professionals at Behavioral Health were opinions as to Plaintiff's functionality and should have been discussed by the ALJ. Plaintiff maintains these GAF scores contradict the opinion evidence of Drs. Lewis, Phillips, and Vea in that the GAF scores are indicative of a greater degree of limitation than that asserted by any of the examining or reviewing physicians. Plaintiff contends the Social Security Administration requires adjudicators to consider these GAF scores as opinions, and Plaintiff attached a copy of Social Security Administrative Memorandum AM-13066 as an exhibit to her opening brief. (Doc. 18-1.)

The GAF scale is a numerical continuum that rates overall psychological functioning on a scale of 0 to 100 and is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000) (Text Revision) ("DSM-IV-TR") at 34. A rating of 21 to 30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment; a rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas; a rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61 to 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning.

For purposes of Social Security disability benefits, GAF scores are not dispositive of whether a claimant is disabled or functionally impaired. *See, e.g., Garcia v. Astrue*, 10-cv-0259 GGH, 2011 WL 4479843, at *5 (E.D. Cal. Sept. 26, 2011). GAF scores have also been deemed unreliable, and it was "recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders DMS-5 16 (5th ed. 2013). In an effort to clarify the appropriate reliance on GAF scores in adjudicating disability

13

claims, the Social Security Administration released an Administrative Memorandum AM-13066 (the "AM"), effective date July 22, 2013, that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment Functioning (GAF) ratings when assessing disability claims involving mental disorders." (Doc. 18-1, p. 2). The AM emphasizes that "GAF ratings are not standardized," and that the "GAF is neither standardized nor based on normative data . . . . This limits direct comparability of GAF scores assigned by different evaluators." (Doc. 18-1, p. 2.)

The Supreme Court has held that "[i]nterpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference. Instead, interpretations contained in formats such as opinion letters are entitled to respect under [the Court's] decision in *Skidmore v. Swift*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). *See also Community Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 791 (9th Cir. 2003) ("Pronouncements in manuals like the PRM [CMS's Provider Reimbursement Manual], which do not have the force of law, are entitled to less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking."). Thus, AM-13066 is only entitled to some deference to the extent it is persuasive, but it is not accorded the force of law or even *Chevron*-style deference.

As recognized by AM-13066, a GAF rating is medical opinion evidence as defined in 20 C.F.R. § 404.1527(a)(2). The AM-13066 provides guidance for consideration of this opinion evidence:

> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be sued to "raise" or "lower" someone's level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

Plaintiff was assigned GAF scores by the medical professionals she saw at Behavioral Health between February 2011 and July 2012:  In February 2011, Plaintiff was assigned a GAF of 50 (AR 190) by therapist Guy Gadd; a GAF of 69 by Dr. Ramsey on April 11, 2011 (AR 248); a GAF of 45 by Dr. Ramsey on June 9, 2011; a GAF of 51 by Dr. Tokat in July, October, November, and December 2011, and February 2012 (AR 176, 323, 343, 356, 359-60); a GAF of 61 by Dr. Tokat in March 2012 (AR 173), and a GAF of 55 by Dr. Rose in July 2012 (AR 171).

Plaintiff was also assigned a GAF of 30 on admission to Good Samaritan Hospital on February 21, 2011, after a suicide attempt (AR 228), and a GAF of 50 upon discharge on February 23, 2011 (AR 228-29).  In June 2011, Plaintiff was assigned a GAF of 63 by Dr. Lewis. (AR 261.)

Not a single GAF score assigned by any treater was explained.  The scores assigned are only a snapshot of a particular grouping of symptoms presented that day, but no treater explained *how* the scores were assessed and *what* symptoms were emphasized by the scores.  As explained by AM-13066, the scores themselves have little probative value where no provider explained the basis for the score assigned or the particular symptoms upon which the score was predicated. (Doc. 18-1, AM-13066 ("The GAF scale anchors are very general and there can be a significant variation in how clinicians rate a GAF . . . . Interpreting the GAF rating requires knowing what the clinician was focusing on when assigning the overall rating.").)  Given the little probative value of these GAF scores, the ALJ did not err in failing to expressly address these scores.  *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (Commissioner need not discuss all evidence presented, only that which is significant and probative).  As already noted, Plaintiff's records from Behavioral Health and her admission/discharge summary from Good Samaritan Hospital containing these GAF scores were considered by each of the state agency examining and reviewing physicians, Drs. Lewis, Phillips, Vea, and Aquino-Caro, none of whom considered these GAF scores to be indicative of Plaintiff's longitudinal functional ability.  Without any medical evidence contradicting these physicians' opinions, the ALJ would simply have been supplanting his *own* interpretation of the various GAF scores in place of the opinions of these physicians who reviewed Plaintiff's treating records containing the GAF scores.  Although the

ALJ is to weigh the medical evidence and interpret it, *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), he or she is not empowered to independently assess clinical findings and reject multiple medical opinions based on the ALJ's own independent interpretation of unexplained GAF scores, s*ee Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999)*; see also Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings").  In other words, had the ALJ interpreted the GAF scores and addressed them as Plaintiff suggests, he would have improperly rendered a medical opinion.

Plaintiff also argues that when considering the GAF scores as a whole, it is clear her condition waxes and wanes, as is expected with mental impairments.  While this observation may be generally correct, the state agency physicians considered Plaintiff's medical records at many points during Plaintiff's treatment at Behavioral Health — specifically in June 2011 (AR 257-63), July 2011 (AR 264-76), August 2011 (AR 307), and March 2012 (AR 377).  The reviewing physicians, particularly Drs. Vea and Aquino-Caro who reviewed Plaintiff's records last, had access to all of Plaintiff's 2011 treating records and could see how Plaintiff's symptoms fluctuated over time.  Even considering these treatment records, their professional assessments remained that Plaintiff's mental impairment was not severe.  The ALJ was entitled to give these opinions weight, even to the extent Plaintiff believes, in her lay opinion, the evidence is conducive to a different conclusion regarding the severity of her condition.

//
//
//
//
//
//
//
//

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 29, 2016**                    **/s/ Sheila K. Oberto**
                                               UNITED STATES MAGISTRATE JUDGE